**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DASHAUN WHITE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | **Civil Action No. 09-4802(SRC)** |
| v. | : | |
| | : | **OPINION** |
| STATE OF NEW JERSEY, ET AL., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**CHESLER**, District Judge

      This matter comes before the Court on two motions: (1) the motion for partial summary judgment filed by Plaintiff Dashaun White ("Plaintiff" or "White") [docket entry 55]; and (2) the motion for summary judgment and/or judgment on the pleadings, filed by Defendants James Couro ("Couro"), Michael Floyd ("Floyd"), Larry Glover ("Glover"), George W. Hayman ("Hayman"), Dominick Iantorno ("Iantorno"), Mountainview Youth Correctional Facility ("MYCF"), the New Jersey Department of Corrections ("NJDOC"), Edwin Rodriguez ("Rodriguez"), Gerard Schenck ("Schenck"), Richard Tattoli ("Tattoli"), the State of New Jersey, Robert Trent ("Trent"), Clinton White, and James Williams ("Williams") (collectively, "Defendants") [docket entry 56].  The Court has opted to rule based on the papers submitted and without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons expressed below, the Court will grant Defendants' motion for summary judgment, and deny the Plaintiff's motion for summary judgment on the issue of liability.

I.   **FACTUAL BACKGROUND**[1]

This case arises from a brutal assault on Plaintiff Dashaun White during his incarceration at MYCF, a youth detention facility operated by the NJDOC.  Plaintiff was attacked by other inmates in the facility, and suffered severe injuries.  He now brings constitutional claims and state tort claims against certain corrections officers and investigators, their supervisors, MYCF and its Administrator, the Department of Corrections, the Commissioner of the Department of Corrections, and the State of New Jersey, alleging that these individuals and entities were either deliberately indifferent to a known risk of harm to him, or were negligent.

Plaintiff was incarcerated on March 15, 2007[2] to serve a four-year prison term with two years of parole ineligibility, following his conviction for possession of heroin with intent to distribute within 1,000 feet of a school zone.  He was interviewed for detention classification purposes on March 16, 2007, at the NJDOC's Central Reception and Assignment Facility ("CRAF").  During the interview, a Special Investigations Division ("SID") investigator asked Plaintiff a series of screening questions, and determined that he was a member of a gang, or – in penological parlance – a member of a Security Threat Group ("STG").[3]  A STG face sheet (also

---

[1] The Court notes that the parties' respective statements of undisputed material facts in this matter were argumentative and largely unhelpful.  Plaintiff's statement was not submitted with his initial motion for partial summary judgment, as required by Federal Rule of Civil Procedure 56.1(a), but was instead submitted in his opposition to Defendants' motion for summary judgment and statement of undisputed facts.  Moreover, Plaintiff's submission failed to comply with Rule 56.1(a)'s requirement that a responsive statement indicate agreement or disagreement with each of the movant's asserted facts.

[2] Plaintiff entered a guilty plea, and was sentenced on March 1, 2007.  (Wise Decl., Ex. D.)

[3] N.J.A.C. 10A:3-11.2 defines a STG as a "group of inmates possessing common characteristics, interests and goals which serve to distinguish the group or group members from other inmate groups or other inmates and which, as a discrete entity, poses a threat to the safety of the staff, other inmates, the community or causes damage to or destruction of property, or

known as a "gang face sheet") prepared by the SID investigator indicates that Plaintiff was identified as a member of the "Bloods/All Bout Money (ABM)" gang, based on two tattoos,[4] and on his self-admission that he had been a member of the gang for seven years.  (Burke Decl., Ex. C.)  White's deposition testimony contradicts this record of gang membership.  White asserts that he was never a member of the Bloods – though his siblings were affiliated with the gang – but, because three dog paws indicates Blood affiliation, White's two dog paw marks[5] could be misinterpreted by other inmates.  (Vanella Decl., Ex. A, White Dep. at 45:6-13, 48:16-50:4-6.)[6] White claims he therefore advised the SID Investigator that his dog paw burn marks might get him "into trouble with the Bloods, any Bloods," although this is not reflected on the gang face sheet, or other intake documentation.  *Id.* at 11:9-10.

White was initially housed in the minimum security unit of MYCF, also known as the "cottages," but was moved into the Full Minimum Unit ("FMU"), the least restrictive custody setting in the facility (and in the State of New Jersey), on or about May 23, 2007.  (Wise Decl., DOC847-848; Vanella Decl., Ex. A, at 32:12-36:3.)  According to Defendant Schenck, a Lieutenant at MYCF, inmates in the FMU have relative freedom of movement in the facility and its yard, and "are pretty close to going home.  They've demonstrated good behavior over a period

---

interrupts the safe, secure and orderly operation of the correctional facility(ies)."

[4]Photographs of Plaintiff's tattoos are appended to the face sheet; these show Plaintiff's two dog-paw shaped marks on the right arm, and his "ABM" tattoo on the left arm.  (Burke Decl., Ex. C.)  It is uncontested that "ABM" or "All 'Bout Money" is a "set" of the Bloods gang.

[5]White testified that he gave himself one of the dog paw marks as an "experiment," and incurred the other mark from a cigarette burn, during a fight.  (Vanella Decl., Ex. A, White Dep., at 45:6-9.)

[6]Plaintiff's expert, James E. Lawrence, opines that Plaintiff's two dog paw tattoos would have appeared to be a "partial" United Blood Nation ("UBN") tattoo.  (Vanella Decl., Ex. F, at 3.)

of time to make it to this area." (Vanella Decl., Ex. C, at 59:22-25.)  White describes the

difference between minimum and full minimum custody: ". . . minimum means you got to stay

behind the wall. . . . Full minimum means you can go to the camps, you got a lot of comp time,

and if you don't mess up you can leave prison early . . ." (Vanella Decl., Ex. A, White Dep., at

32:20-33:18.)  The FMU is comprised of three buildings, two of which house inmates in "pods"–

large dorm-style rooms which surround common areas shared by the inmates.  (Wise Decl., Ex.

C; Vannella Decl., Ex. K, Int. Ans. 7.)  Building 1 and Building 2 each have two wings, with 96

inmates in each wing, and sixteen inmates in each pod.  (Melody Cert., Ex. B, at 2.)  The pods

contain emergency exit doors (which open only from the inside) to the outside area, including the

yard, of the fenced-in FMU facility. (Vanella Decl., Ex. K, Int. Ans. 1; Wise Decl., Ex. C.)

Inmates in the FMU alternate recreational time in the yard according to the building in which

they are housed.[7]  An inmate from one building may obtain permission to enter the other building

for medical or dental treatment, to use the law library (which is in one building only), for classes,

and the like.  (Vanella Decl., Ex. C, at 60:17-63:4; Ex. B at 61:13-62:4, 106:22-107:3.)

Moreover, it is possible for an inmate from one building to enter the other even absent

permission because of the minimum security environment.[8]  (Vanella Decl., Ex. C, at 67:9-15.)

Although MYCF tracks STG membership amongst the inmates (as reflected by White's gang

---

[7]For example, inmates in Building 1 will remain in their building while the inmates in Building 2 have recreational time in the yard.

[8]Lieutenant Schenck testified that inmates are expected to enter and exit the buildings through the main entrances, although there are emergency exit doors to the Buildings, so that officers are able to keep track of inmate location, to deter escape attempts, and to ensure that inmates are within their assigned pods.  However, because there are roughly 200 inmates in each building, that "can move around anywhere at any point," the officers stationed at the main entrances of the buildings don't necessarily know which building a particular inmate lives in, and it would therefore be "very possible" for a given inmate to walk into the other building without permission.  (Vanella Decl., Ex. C., at 67:18-72:7.)

face sheet), it does not segregate inmates on the basis of that status for housing purposes in the FMU. (Vanella Decl., Ex. D, at 34:11-35:1.) However, any reported threats or assaults within the facility (including those related to STGs) are handled by offers of protective custody to the vulnerable inmate, followed by investigation; the facility may also impose temporary close custody, keep separate status, administrative transfers or segregation. *Id.* at 40:21-25; Ex. C, at 175:13-187:5. SID officers also receive STG training, and certain designated officers from MYCF (including Defendant Williams) met on a regular basis in 2007, to discuss gang-related intelligence and activity in their facility and other facilities. *Id.*, Ex. D, 19:5-20:2, 32:22-33:5; Ex. E, at 19:2-12, 52:10-58:12.[9]

On or about May 17, 2007, while White was still housed in the cottages, he was injured in an incident described in MYCF records as a basketball-related eye injury. (Dilts Decl., Ex. A.) However, White testifies that the black eye resulted from a fight, which commenced when a another inmate, Kashif Lewis, nicknamed "G-Rabb," saw White's dog paw markings, and confronted him about whether he was a Blood. (Vanella Decl., Ex. A, at 39:6-18; 67:4-10.) White denied it, and the other inmate tried to hit him; White struck back, and more inmates joined the fight. *Id.* A Corrections Officer ("CO") broke up the fight, and escorted White to the nurse's office. White testifies that, on the way, when he was reticent to discuss with the CO the cause of the fight, the CO pulled White into a "private room" and asked what had really happened, whereupon White explained that he "got jumped" by a couple of Bloods. *Id.* at 98:16-100:2. White states he advised the CO that one of the Bloods had asked whether White was a Blood. White told the CO: "it's going to be a problem about these marks on my arms." *Id.* at

_____

[9]SID Officer Williams testified that he attended a monthly meeting in Trenton for all SID officers designated as "gang monitors," and informal weekly or semi-monthly meetings in MYCF with corrections staff to discuss gang-related issues.

42:2-5.  White does not know the name of this CO.  White avers that he then gave a statement to one of the sergeants on duty, summarizing what had happened to the best of his ability.  *Id.* at 43:22-44:17.  However, the record of White's statement, produced in discovery, merely reads: "I was playing basketball and got hit in the eye."  (Dilts Decl., Ex. A.)  Moreover, the statement is dated May 23, 2007, several days after the alleged cause of the injury.  Indeed, Defendants maintain that White's eye injury was only discovered because he was transferred from the cottages to FMU on May 23, 2007.

The Incident Report regarding the injury to White's eye, dated May 23, 2007, reflects that White was offered protective custody, and appended to the report is a form with White's signature, indicating his rejection of protective custody.  *Id.*  When asked why an inmate with an alleged basketball-related injury would be offered protective custody, Lieutenant Schenck advised that corrections officers are trained to make an independent assessment of such situations: if an inmate claims to have been injured in a basketball game, but the injury is of the sort not typically incurred during that activity, then the officer should offer the inmate protective custody, even if the inmate will not disclose further information about the source of the injury. (Vanella Decl., Ex. C, at 185:16-187:5.)

White was transferred to Building 2, North Wing in the FMU on or about May 23, 2007.  White testifies that the Blood-member inmates who "jumped" him and injured his eye were moved into Building 1 of the FMU shortly thereafter.  According to White, when the inmates in Building 1 used the recreation yard, these Blood-members would walk over to the door of White's pod in Building 2, which abuts the recreation yard, and verbally threaten him through the closed door.  *Id.*, Ex. A, at 39:19-40:15, 100:18-101:14.  The threats were made on a weekly basis, and White claims that he informed a CO on each occasion, though no action was taken.  *Id.*

at 100:24-102:20.  There are no MYCF records of any inmate remedy forms filed by White

regarding these threats, and indeed, White testifies that he did not file a formal or other written

complaint regarding the threats.  *Id.* at 114:9-115:3.  Moreover, White could not say which of the

CO(s) he verbally complained to regarding the threats.

Several months following his transfer to the FMU, on the morning of October 29, 2007,

White was found unconscious and bleeding from the head, having been beaten by an unknown

number of inmates.  On that date, there were, as usual, eight officers on duty at the FMU during

the 6:00 a.m. to 2:00 p.m. shift: six COs, a Lieutenant (Defendant Schenck) and a Sergeant

(Defendant Rodriguez).  *Id.*, Ex. C, at 51:14-52:6; Ex. B, 83:8-84:20.  One of the COs on duty

was Corrections Officer Recruit ("COR")[10] Iantorno, who was the only officer assigned to the

North side (Plaintiff's side) of Building 2, and was positioned by the guard station at the

building's front entrance.  *Id.*, Ex. B, at 49:15-50:2, 68:4-22.  COR Iantorno was thus responsible

for supervising the 96 inmates in the North wing of Building 2, of whom approximately 30 were

out of the Building, for work or other activities, on October 29, 2007.  *Id.* at 93:4-7.  Lieutenant

Schenck and Sergeant Rodriguez were stationed in the support building, though it was standard

practice for them to make tours of the Buildings, including each of the pods, during their shifts

(at least once per shift for the Lieutenant, and at least twice per shift for the Sergeant).  *Id.*, Ex. C,

at 53:12-54:18.

At 10:45 a.m., just prior to Plaintiff's assault, the emergency exit door for pod number 5

of Building 2, North Side, was opened by COR Iantorno, either at his own discretion, or with

Lieutenant Schenck's authorization, in order to ventilate the area, which was being painted by

---

[10]CORs are officers who have graduated from the corrections academy, but are in a one-year probationary period as corrections officers, after which, if their performance is satisfactory, they become Senior Corrections Officers (SCOs).  (Vanella Decl., Ex. B., at 13:15-18.)

inmates.  (Vanella Decl., Ex. B, at 104:7-105:17; Ex. C, 153:18-21.)  Although a visible and

audible alarm would normally signal the emergency egress exit door having been opened, COR

Iantorno disabled the alarm.  *Id.*, Ex. B, at 125:5-130:6.  Inmates from Building 1 were in the

yard for recreation at this time.  (Melody Decl., Ex. B, at 2.)  At approximately 10:50 a.m.,

Lieutenant Schenck, who was conducting a routine tour of the Buildings, entered pod number 5

in the North wing of Building 2, and found White lying unconscious, bleeding from the right side

of his face.  *Id.*  According to Lieutenant Schenck, he yelled for a medical emergency code to be

transmitted to the Center Control.  (Vanella Decl., Ex. C, at 129:15-135:23.)  While waiting for

assistance, Lieutenant Schenck was told about another inmate, Floyd Bynum, who had exited pod

number 4, bleeding from his swollen right eye.  *Id.*  Lieutenant Schenck again called for medical

assistance, and additional medical and custody personnel reported to the area.  (Melody Decl.,

Ex. B, at 2.)[11]  Sergeant Rodriguez, who had received Lieutenant Schenck's 10:50 a.m. call,

reported to the area, and upon arrival, sent for an ambulance.  *Id.*  White was evacuated via

helicopter to Morristown Memorial Hospital, where he was found to have sustained "extensive

facial and head trauma/fractures, possible brain injury," and "required a tracheotomy and feeding

tube placement."  *Id.* at 1.  White's testimony confirms that he was hospitalized for months

following this assault, during which he was in a coma, and on various forms of life-support.

(Vanella Decl., Ex. A, at 74:7-75:9.)  White's injuries were so severe that he had to undergo

therapy in order to begin walking and speaking again.  *Id.* at 76:9-12.

     In his deposition testimony, White gives the following account of the October 29, 2007

---

[11]The sequence of events given by COR Iantorno is slightly different.  He states that he was preparing paperwork just before 11:00 a.m., when inmate Bynum appeared beside his desk, bleeding from the head.  (Vanella Decl., Ex. B, at 140:6-143:23.)  COR Iantorno asked if Bynum needed a nurse, at which point he heard Lieutenant Schenck's emergency code over the radio, and responding officers arrived.  *Id.*

assault: he was in the indoor recreation area of Building 2, in the midst of writing a letter, when he was attacked. *Id.* at 63:8-64:17. He states that his attackers caught him by surprise, from behind, hitting him with weights, and that the assailants were other inmates, not corrections officers. *Id.* at 64:25-68:2. He recalls that there were more than five attackers, and he believes that one of them was the Blood-member from Building 1, nick-named G-Rabb. *Id.* at 66:15-68:2. Moreover, he asserts that he saw inmates from Building 1 attack another person in Building 2 approximately half-an-hour before he was attacked. *Id.* at 68:18-69:23. Indeed, White asserts that this other inmate was discovered by COs and sent to the nurse before White was attacked. *Id.* at 70:6-12. White claims that he was attacked for 30 or 45 minutes, being punched and kicked, until the attackers knocked him unconscious with a dumbbell. *Id.* at 70:13-71:11. White believes that he was attacked because of the dog-paw markings on his arms. *Id.* at 73:24-74:2.

SID Senior Investigators Trent and Williams conducted an investigation of the assaults on Bynum and White. They reviewed the statements of Lieutenant Schenck, Sergeant Rodriguez, COR Iantorno, and other custody officers; investigated evidence (such as bloody sheets/clothing) seized on the date of the assaults interviewed White and Bynum; interviewed and re-interviewed dozens of inmates; and conducted photo line-ups. The investigators suspected that the attack was motivated by gang-related hostility, in light of White's status (or perceived status) as a Blood. (Vanella Decl., Ex. D, at 63:7-20.) Moreover, examination of phone records for a known Blood-member, Kashif Lewis ("G-Rabb") revealed a conversation on October 22, 2007, in which a third-party male indicated that there needed to be a "hit." (Melody Decl., Ex. B, at 5.) However, following a year of investigation, Trent and Williams concluded that, due to "lack of cooperative witnesses," lack of evidence, and White's inability to give accurate information about the facts

surrounding the incident (likely resulting from the trauma of the assault), no viable suspects

could be identified.  *Id.* at 7-8.

Plaintiff filed a Complaint in New Jersey Superior Court, Essex County, on June 25,

2009, against the State of New Jersey; the NJDOC and its Commissioner, Hayman; MYCF and

its Administrator, Glover; Lieutenant Schenck; Sergeant Rodriguez; COR Iantorno; Senior

Investigator Trent; Senior Investigator Williams; Senior Corrections Officer ("SCO") Floyd; CO

Couro; CO Tattoli; and SCO White.  Plaintiff raises claims under 42 U.S.C. § 1983, alleging that

Defendants were deliberately indifferent to a known risk of harm to him, and failed to protect

him, in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United

States Constitution.  Plaintiff claims that Defendants' conduct also violates the New Jersey State

Constitution, and constitutes gross negligence and willful misconduct.

Defendants removed this action to The United States District Court for the District of

New Jersey on September 17, 2009.  Discovery in this action having concluded, Plaintiff filed a

motion for summary judgment on the issue of Defendants' liability for the violations set forth in

the Complaint.  Defendants filed a separate motion for summary judgment on all of Plaintiff's

claims.

## II.   DISCUSSION

### A.  Standards of Review

#### 1.  Judgment on the Pleadings

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are

closed – but early enough not to delay trial."  Fed.R.Civ.P. 12(c).  Though procedurally it applies

later in a case than a Rule 12(b) motion, which may be filed in lieu of a responsive pleading, a

motion brought under 12(c) for failure to state a claim upon which relief may be granted is

governed by the same standard applicable to Rule 12(b)(6) motions.  *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 127 S. Ct. at 1964 (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (internal citations omitted); *see also* FED. R. CIV. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citations omitted).  "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1

F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice & Procedure* Civil 2d § 1357 at 340 (2d ed. 1990)).

      While a court will accept well-pled allegations as true for the purposes of the motion, it

will not credit bald assertions or legal conclusions. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d

902, 906 (3d Cir. 1997).

      In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the

allegations of the complaint, as well as documents attached to or specifically referenced in the

complaint, and matters of public record. *Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259

(3d Cir. 1998); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice &*

*Procedure*: Civil 3d § 1357 (3d ed. 2007).  "Plaintiffs cannot prevent a court from looking at the

texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In*

*re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

      2.   Summary Judgment

      Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*,

223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must

construe all facts and inferences in the light most favorable to the non-moving party.  *See Boyle*

*v. Cnty. Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of

establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).  Where, as here, the nonmovant (plaintiff) would bear the burden of

persuasion at trial, "the party moving for summary judgment may meet its burden of proof by showing that the evidentiary record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden at trial." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 [43 Fair Empl. Prac. Cas. (BNA) 681] (3d Cir.), *cert. dismissed*, 483 U.S. 1052 (1987).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 247-48. Pursuant to Federal Rule of Civil Procedure 56(e), the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), *cert. denied*, 507 U.S. 912 (1993)).

### B. Defendants' Motion for Summary Judgment and/or for Judgment on the Pleadings

Defendants move for summary judgment, and/or judgment on the pleadings, on all of Plaintiff's claims. First, with respect to Plaintiff's section 1983 claims brought against the State of New Jersey, the NJDOC, MYCF and the other Defendants in their official capacities, Defendants argue that they are not persons amenable to suit thereunder, and accordingly, all such claims must be dismissed with prejudice. Second, with respect to Plaintiff's section 1983 claims against the individual Defendants, in their personal capacities, Defendants argue that same must

fail for lack of proof that any individual Defendant was deliberately indifferent to a substantial

risk of harm to Plaintiff.  In the alternative, Defendants argue that Plaintiff's section 1983 claims

against the individual Defendants must be dismissed with prejudice based on qualified immunity.

Defendants argue that they are also entitled to judgment on the pleadings, or summary judgment

on Plaintiff's negligence claims, pursuant to the immunity conferred by the Tort Claims Act,

N.J.S.A. 59:5-2b(4).  Finally, Defendants argue that Plaintiff's state constitutional claims must be

dismissed, as these claims are analogous to Plaintiff's federal Eighth Amendment claims.

Although the Court is sympathetic to Plaintiff's injuries, it concludes that Defendants are

entitled to summary judgment on all Counts of Plaintiff's Complaint, because the factual record,

viewed in the light most favorable to the Plaintiff, cannot as a matter of law support the

conclusion that the brutal attack on Plaintiff was the result of any deliberate indifference or

willful misconduct on the part of the Defendants.

1. <u>Section 1983 Claims against the State, NJDOC, MYCF and Individual</u>

<u>Defendants in their Official Capacities</u>

Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
any State or Territory or the District of Columbia, subjects, or causes to be subjected, any
citizen of the United States or other person within the jurisdiction thereof to the
deprivation of any rights privileges or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress.

Section 1983 is not a source of substantive rights; rather, it allows a plaintiff to vindicate

violations of rights conferred by the United States Constitution or federal law.  *See Baker v.*

*McCollan*, 443 U.S. 137, 145 n.3 (1979).  The defendant in a section 1983 action, to be liable

within the meaning of the statute, must be a "person."  A State is not a "person."  *Will v.*

*Michigan Dept. of State Police*, 491 U.S. 58, 70-71 (1989) (holding that "section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."). Likewise, state agencies and state officials sued in their official capacities are not persons within the meaning of § 1983. *Id.* at 71 (holding that a suit against a state official in his or her official capacity is not a suit against the official, but a suit against the official's office, and is thus "no different than a suit against the State itself.").

In the case at bar, Plaintiff raises claims labeled as constitutional claims, Eighth Amendment claims, Fourteenth Amendment claims, and section 1983 claims, against all Defendants, including the State of New Jersey, the NJDOC, MYCF, and all Defendants in their official and individual capacities.  (Compl., Counts I-V, VIII.)  Plaintiff alleges violations of his federal constitutional rights "under color of state law" in each of these Counts, and therefore the Court construes them as claims pursuant to section 1983.  As set forth above, states, state agencies, and state officials sued in their official capacities are not "persons" within the meaning of section 1983.  Although state officials may, under some circumstances, be subject to suit under section 1983 for prospective relief, Plaintiff seeks monetary damages, and does not seek any specific injunctive or declaratory remedies.  *Id.* at 21, Prayers for Relief; *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (acknowledging that section 1983 provides a cause of action against a state official acting in his official capacity to enjoin the official from continuing to violate federal law, since, in that case, the state could not have authorized the official's actions).  Accordingly, Plaintiff's section 1983 claims against the State of New Jersey, the NJDOC and MYCF (state agencies), and the Defendants in their official capacities must be dismissed for failure to state a claim upon which relief may be granted.  *See also, e.g., Estate of*

*Wilson v. N. State Prison*, No. 07-1942, 2008 U.S. Dist. LEXIS 47381, at *8 (D.N.J. July 18,

2008) (holding, "in agreement with other courts within this district, that the New Jersey

Department of Corrections and Northern State Prison are arms of the State of New Jersey and are

not subject to suit under Section 1983.") (citing, *inter alia, McDaniel v. N.J. Dept. of Corr.*, No.

08-0239, 2008 U.S. Dist. LEXIS 15625, at *8-9 (D.N.J. Feb. 29, 2008); *Robles v. Albino*, No.

07-1026, 2007 U.S. Dist. LEXIS 44227, at *10-11 (D.N.J. June 19, 2007)).

2. <u>Section 1983 Liability of Defendants in their Individual Capacities</u>

The Court construes Plaintiff's claims in Counts I-V and VIII to raise allegations of

deliberate indifference under the Eighth Amendment to the United States Constitution.[12]  It is

clear that "prison officials have a duty . . . to protect prisoners from violence at the hands of other

prisoners." *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988) (internal

citations and quotation marks omitted), cert. denied, 488 U.S. 823 (1988).  Thus, "[a] prison

official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the

Eighth Amendment." *Farmer v. Brennan*, 511 U.S. at 828.  However, while prison officials are

responsible for the safety of inmates, every injury by one inmate at the hands of another does not

"translate to constitutional liability" for the responsible prison official(s); rather, a prisoner

---

[12]Plaintiff also cites "liberty interests firmly grounded in the Due Process Clause of the
Fourteenth Amendment" in his Complaint, but does not explain the Amendment's applicability
to his allegations, nor is the Fourteenth Amendment raised in the parties' respective summary
judgment briefs.  Constraints on the power to punish are the concern of the Eighth Amendment,
whereas the Fourteenth Amendment safeguards the rights of pretrial detainees against detention
conditions that amount to punishment, since pretrial detainees have not been adjudicated as
guilty of any crime, and thus the State has not acquired the power to punish.  *See, e.g., Natale v.
Camden County Correctional Facility*, 318 F.3d 575, 581 (3d Cir. 2003); *see also Ingraham v.
Wright*, 430 U.S. 651, 671-72 n.40 (1977).  Here, Plaintiff was incarcerated pursuant to a
criminal conviction at the time of the injuries which form the subject of his suit, and thus Eighth
Amendment is the applicable standard under which his claims of deliberate indifference must be
analyzed.  *Id.*; *see also Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

claiming violation of his Eighth Amendment rights must show: (1) prison conditions posing a substantial risk of serious harm, and (2) the prison official(s)' deliberate indifference to inmate health or safety. *Id.* at 834.

In order to show prison conditions posing a substantial risk of harm, "an inmate must show 'a *pervasive* risk of harm to inmates from other prisoners.'" *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973))(emphasis added). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." *Id.* (quoting *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985)).

Deliberate indifference "describes a state of mind more blameworthy than negligence." *Id.* at 835 (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)). A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Id.* at 837 (emphasis added). This standard reflects the Eight Amendment's ban on cruel and unusual "punishments" as opposed to cruel and unusual "conditions;" thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious, such that a reasonable man would realize it . . .but the inference cannot be conclusive, for we know that people are not always conscious of what

reasonable people would be conscious of." *Id.*

Defendants argue that Plaintiff has failed to produce facts showing that prison conditions in the FMU on October 29, 2007 posed a substantial risk to his safety, or that the named Defendants were deliberately indifferent to such risk(s). Plaintiff makes two types of claims regarding the prison conditions at the time of his assault, which the Court will address by category: (1) "General" conditions in the FMU which allegedly posed an ongoing, substantial risk of inmate violence in that housing facility; (2) conditions which posed a substantial risk of violence with respect to Plaintiff, specifically. Following an analysis of whether Plaintiff has shown a genuine issue of material fact on whether these conditions in fact posed a substantial risk to Plaintiff's health and safety, the Court will consider whether the named Defendants were deliberately indifferent to the risk(s).

a. General Prison Conditions

Plaintiff argues that conditions in the FMU generally posed a substantial risk to his safety. Specifically, Plaintiff's expert, James E. Lawrence, the Director of Operations of the New York State Commission of Correction in Albany, New York, opines that: (1) inmates in the FMU were not classified pursuant to a reasonable comprehensive inmate classification program, permitting known and dangerous STG members to be housed in a minimum security facility; (2) uniformed custody staff at the FMU were inadequately trained in fundamental STG awareness and management; and (3) the FMU was understaffed and overcrowded. (Vanella Decl., Ex. F, at 13-14.) As a result, Plaintiff asserts, STG members were able to access Plaintiff's building unobserved on October 29, 2007, and brutally assault him.

With respect to the first argument, Plaintiff and his expert criticize the NJDOC's

classification system, which they allege focuses on in-custody behavior histories, "without reference to risk factors such as identification of alleged core or leadership STD membership, prior criminal history, propensity for predation or victimization, history of hostile relationships with other inmates, history of assault or propensity for physical violence." *Id.* at 13.  The NJDOC recognizes six levels of custody: close custody, maximum custody, medium custody, gang minimum custody, full minimum custody, and community custody.  N.J.A.C. § 10A:9-4.1. Inmates within the NJDOC are assigned to a particular custody status pursuant to an "Objective Classification Process" which utilizes a scoring instrument, taking into account factors such as the severity of the inmate's offense, escape history, institutional violence, prior assaultive offense history, prior felony convictions, stability factors (such as age, education and employment history), number of disciplinary reports, severity of disciplinary infractions, and participation in programs. § 10A:9-2.2(b), -2.4, -2.6.  This instrument produces a initial custody status score for an inmate, which may be overridden by certain specified factors (e.g., unfavorable psychiatric reports, specialized substance use disorder screening, the best interests of the inmate, and so forth).  § 10A:9-2.14.  Enforcement of the initial classification procedure is executed by the NJDOC's Division of Operations.  § 10A:9-1.2a.  When determining whether an eligible inmate should be reclassified into a lower custody status, the Institutional Classification Committee ("ICC") considers the aforementioned criteria, together with additional considerations (such as adjustment to the correctional facility, and reports from staff).  *Id.* at § 10A:9-4.5(a).

In sum, specific criteria govern an inmate's eligibility for placement in the FMU, including his criminal history, any pending criminal charges, and the nature of the offense for which he was incarcerated.  Indeed, such factors may render and inmate ineligible for placement in the FMU (for instance, where the inmate has open charges for offenses such as homicide, car-

jacking, or terroristic threats, or where an inmate has more than a certain length of time remaining on his sentence).  *Id.* at § 10A:9-4.6; (Vanella Decl., Ex. H, Holvey Expert Rep., at 10) ("According to the NJDOC 2010 Annual Report . . . . Inmates housed in the FMU . . . are younger inmates with very little time left on their sentences.  Their short time is a deterrent to any disciplinary infractions, especially violent behavior.").  Thus, Mr. Lawrence's opinion that the NJDOC and MYCF failed to maintain a classification system that took into account risk factors such as prior criminal history and history of assault is belied by the administrative system set forth above.  Indeed, Mr. Lawrence admitted in his deposition that he did not review the foregoing classification procedures in formulating his opinion.  (Vanella Dec., Ex. G, at 51:13-22.)

Mr. Lawrence further opines that, from his limited knowledge of the NJDOC's classifications procedures, they are inadequate in ways that contributed to White's vulnerability to assault; namely, Mr. Lawrence testified that he would never consider placement of known STG-members in a minimum security facility.  *Id.* at 55:17-19.  However, Mr. Lawrence points to no evidence, apart from the assaults on White and Bynum, that the housing of STG members in the FMU presented a substantial risk of violence among inmates.  For instance, the Court has not been presented with statistics showing a pervasive level of inmate assaults in the FMU, or with evidence that most other Corrections Departments in the United States bar the placement of known STG-members in minimum security settings.  Therefore, the Court cannot conclude that the general practice of allowing known STG members to be placed in FMU posed a substantial risk of serious harm to White and other inmates.  Moreover, nothing in the record contradicts the

testimony of Defendants' expert, Mr. Holvey,[13] that it is virtually impossible to maintain gang

separation in any facility within the NJDOC.  *Id.*, Ex. H, at 10.  Indeed, the Bloods are the largest

gang within the NJDOC, with 2,590 known members, in 68 different sets, incarcerated across

thirteen facilities in New Jersey as of August, 2011.  (Vanella Decl., Ex. H, at 9; Ex. F, at 4.)

Mr. Lawrence then contends that, at a minimum, inmates known to be "core" members of

an STG should not have been housed in the FMU, pointing to Kashif Lewis and Floyd Bynum,

whom SID Investigators identified to be leaders in their particular Blood sets.  *Id.*, Ex. E, at 31:8-

35:22.  In 2007 (though not at present), the NJDOC had specialized housing for inmates who

were core members of STGs, known as the Security Threat Group Management Unit

("STGMU").  N.J.A.C. § 10A:5-1.3, 6.6a (amended as recommended by the Department of

Corrections in 43 N.J.R. § 1562(a), 3024(a), now codified at § 10A:3-10.1 *et seq.*).[14]  A "core

member" of an STG was defined as an inmate whose "documented [STG] activity(ies) or

behavior as a member or leader poses a threat" to safety, property, "or the safe and orderly

operation of the correctional facility(ies)."  *Id.*  SID Investigators were authorized to identify an

inmate as a core member of an STG, based on the foregoing behavior, and to recommend

placement in the maximum security STGMU, such that the inmate lost reduced custody status,

and remained in segregated custody "until successfully completing a three-phase behavior-

---

[13]Mr. Holvey is retired from the NJDOC, where he established the Intelligence Section of the Special Investigations Division, and created the current method of identifying STG members. He currently serves on the Executive Board of the East Coast Gang Investigator's Association, Inc., a non-profit organization whose mission is to "enhance the awareness of law enforcement professionals to gang trends and recognition."  (Vanella Decl., Ex. H, at 4.)

[14]The STGMU was closed in 2010, but there remains a system for administrative segregation of any inmates who engage in STG activity, or otherwise demonstrate the need for placement in a higher security setting, including inmates who require protective custody. N.J.A.C. § 10A:5-3.1 *et seq.*, §10A:5-5.1 *et seq.*

modification and education program." *Hetsberger v. Dep't of Corr.*, 395 N.J. Super. 548, 552,

929 A.2d 1139 (N.J. Sup. Ct. App. Div. 2007); N.J.A.C. § 10A:5-6.6(a) (amended as noted

*infra*).[15]  Defendant Trent explains, consistent with this scheme, that although known STG

members were housed with other inmates in the FMU, if they received discipline related to STG

activity or violent behavior, they would be transferred to the STGMU.  (Vanella Decl., Ex. D, at

45:24-46:23.)  In other words, an inmate must have engaged in certain unlawful activities or

behaviors to be have been classified as a core member of an STG and transferred to the STGMU.

Thus, Plaintiff's expert appears to confuse the identification of STG inmates as *leaders* with their

identification as *core members* for custody classification purposes: he does not point to evidence

that Lewis or Bynum engaged in STG activities or violence prior to White's assault on October

29, 2007, such that they should have been transferred to the STGMU; rather, he asserts that their

identification by the SID Investigators as leaders should have rendered them subject to such

transfer.  However, again, there are no facts in the record showing that the NJDOC's

classification policy of identifying only "active" gang leaders as "core members" of an STG for

custody purposes created a pervasive risk of violence among inmates at the FMU.

Second, Plaintiff argues that, given the large number of STG members in New Jersey

Correctional facilities, custody staff at FMU were inadequately trained in STG awareness and

management, creating a risk of harm to him and other inmates.  (Vanella Decl., Ex. F, at 13-14.)

Corrections officers in New Jersey receive an initial 14-week training prior to assignment within

a corrections facility, during which they learn procedures for offering or ordering protective

---

[15]The inmate was given notice and a hearing before a Committee, which determined
whether sufficient information and evidence existed to support the inmate's identification as a
core member of an STG; if so, the inmate was confined in the STGMU, though the inmate had
the right to appeal this determination.  *Id.* at § 6.9-6.11 (amended as noted *infra*).

custody when an inmate reports a threat or injury from another inmate, including gang-related threats.  *Id.*, Ex. B, at 10:20-12:6.  Moreover, as discussed above, SID Investigators receive specialized training, including periodic gang training.  In 2007, some Investigators, such as Defendant Williams, were "gang monitors" who attended monthly update meetings, and held frequent informal meetings with MYCF staff to discuss gang-related issues.  Additionally, as evidenced by White's gang face sheet, STG members are identified by an SID Investigator through an intake process set forth in N.J.A.C. 10A:5-6.5, which provides that inmates identified as STG-members must meet at least two of eight listed criteria.[16]  However, as noted by Senior Investigator Trent, STG information on various inmates is not available to all custody staff in the FMU facility.  (Vanella Decl., Ex. D, at 33:22-33:3.)  Indeed, the STG database, maintained by the SID, is restricted to select personnel at all NJDOC facilities.  *Id.*, Ex. H, at 11.  Defendants' expert, Mr. Holvey, explains that such information is not available to all custody officers because "[p]rison staff has been compromised not only in New Jersey, but in prisons nationwide. . . .One of the primary sources of [contraband in prisons] is corrupt staff who could share gang member lists and other related intelligence information with criminals."  *Id.*

Plaintiff asserts that, because custody staff do not necessarily know which FMU-inmates are members of STGs, they are unable to effectively supervise and protect the inmates, and thus were unable to effectively supervise him on October 29, 2007.  Plaintiff argues that this situation is exacerbated by under-staffing and overcrowding at the FMU, where only one CO is assigned to a wing housing 96 inmates.  Mr. Lawrence asserts that "generally accepted correctional doctrine

---

[16]These include: self-admission, STG tattoo, possession of gang paraphernalia, information from an outside agency, information from an SID investigation, correspondence from other inmates or outside contacts, STG/gang photo, and other factors suggesting that an inmate is involved in STG activity.

and practice holds that a correction officer can reasonably be expected to effectively supervise no more than 60 inmates." *Id.*, Ex. F, at 5.)  As stated above, it was typical for eight officers to be on duty during a given shift at the FMU.  A number of inmates may be out on work assignments during any given shift; for instance, on October 29, 2007, approximately 30 of the inmates in COR Iantorno's wing were out on work assignments (therefore, approximately 66 inmates were under his supervision).  However, the FMU is not a "typical" or even minimum security facility– it is a full-minimum facility, the lowest-security setting in the NJDOC.  Inmates, while assigned to particular housing, are relatively free to come and go between buildings, provided they have a legitimate purpose to do so, and may leave the facility on work-release.  The inmates have been classified pursuant to factors including their respective criminal histories, and have been on "good behavior" for a specified period in order to be placed in the FMU.  Thus, the fact that only one CO is regularly assigned to supervise more than 60 inmates in this facility, while perhaps not ideal, does not appear to be an egregious safety breach, nor does it appear to be a violation of any statutory or administrative policy in the State of New Jersey.  Moreover, the factual record does not show that the NJDOC's policy of withholding certain intelligence information, including STG information, from custody officers on duty at the FMU and other facilities in New Jersey is an inappropriate response to the corruption of prison staff in the United States.  The NJDOC does not ignore the presence of gangs in the FMU: it charges SID Officers with tracking STG members, and, where those members engage in any gang activity or violence, ensuring their placement in higher security settings.  Most importantly, no evidence shows that the FMU is beset with gang violence as a result of lack of supervision or inadequate gang-related training and information for corrections officers.

In sum, while Mr. Lawrence may be correct that his proposed procedures (e.g., more

custody officers on duty in the FMU) are preferable, and could have averted the tragic attack on White, this does not constitute evidence that the Defendants' procedures were so constitutionally deficient that they created a pervasive risk of inmate violence. Indeed, for the reasons set forth above, the Court concludes that there is insufficient factual support in this record for the contention that general conditions in the FMU on October 29, 2007 posed a substantial risk of harm to White and the other inmates.

> b.    Conditions Specific to Plaintiff

Plaintiff further argues that there were certain conditions in the FMU which, in relation to him specifically, created a substantial risk of assault, and that the individual Defendants were indifferent to this risk. Plaintiff asserts that his tattoos tending to identify him as a Blood (and, when he denied being a Blood, as one who was trying to "throw down his colors," or withdraw his membership) placed him at risk of attack by inmate-members of the Bloods, and that the Defendants were put on notice of his vulnerability by: (1) Plaintiff's statements in March of 2007, during his custody classification at CRAF, that his STG tattoos might get him into trouble with Blood-member inmates; (2) Plaintiff's assault in May of 2007 by Kashif Lewis, a Blood-member of the GKB ("Gangster Killer Blood") set; and (3) Plaintiff's complaints from May of 2007 to October of 2007 regarding threats to him from Blood-members in Building 1. Plaintiff asserts that the hand-written note on his gang face sheet, "GKB Food," confirms that the Defendants were aware of Plaintiff's vulnerability prior to the October 29, 2007 assault. In spite of this awareness, Defendants failed to place White in protective custody or otherwise ensure his safety. Indeed, they also failed to listen to the phone conversations of Kashif Lewis, a GKB Blood who received an order for a "hit" during a conversation on October 22, 2007, which might have alerted the FMU staff to a heightened risk of harm to Plaintiff. Instead, Defendants

permitted White to remain in the FMU general population, and, on October 29, 2007, allowed the emergency egress door to White's pod to be opened, and the alarm disabled.  Thus, Plaintiff asserts, Blood-members from Building 1 were able to enter Building 2 and brutally attack him.

This description of Defendants' alleged indifference to specific risks to Plaintiff's safety is simply not supported by the facts in the record.  To be sure, Plaintiff's deposition testimony presents a material dispute as to whether: 1) he notified the SID Investigator, during the CRAF intake process, that his tattoos might get him into trouble with Blood-member inmates; whether 2) he told a CO on May 23, 2007 that the real reason for his black eye was that he had been jumped by a Blood-member; and 3) whether he verbally complained to any CO or other officer from May of 2007 to October of 2007, regarding the alleged verbal threats from Blood-members in Building 1.  However, there is no indication that any of the officers with whom White allegedly shared this information are named as Defendants in this matter.  White does not assert that either of the SID Investigator Defendants, Trent and Williams, were involved in the intake process at CRAF.  White does not assert that any of the COs named in the Complaint were on duty on May 17, 2007, or on the dates when White was threatened by inmates from Building 1. There are no written records of any of the information that White allegedly shared regarding his potential vulnerability to assault, his actual assault in May of 2007, or threats to him from Blood-member inmates, and White concedes that he filed no written complaints.[17]  COR Iantorno, Sergeant Rodriguez, and Lieutenant Schenck attest that they were not aware of any threats to the safety of any inmates, including White, on the morning of October 29, 2007.  (Vanella Decl., Ex.

_____

[17]There is, however, a written record of White's eye injury, including a signed statement by White that he was hit in the eye playing basketball on May 17, 2007, and a form indicating that he refused an offer of protective custody on May 23, 2007.  (Dilts Decl., Ex. A.)

B, at 76:6-77:5, 295:5-10; Ex. C, at 122:13-126:11, 184:16-185:3; Ex. L, Inter. Ans. 4 & 24.)

SID Investigator Trent avers that he was not aware of any threats to inmates at the FMU prior to

his assignment to White's case October 29, 2007, and SID Investigator Williams avers that, on

October 29, 2007, he was not aware of any gang rivalry or issue that may have caused White's

attack.  *Id.*, Ex. D, at 37:3-7; Ex. E, 81:17-22.  Defendants Couro, Floyd, Tattoli, and Clinton

White are officers at FMU, but no evidence in the record demonstrates their awareness of any

risks to White's safety, nor is there evidence showing that they were directly responsible for

Plaintiff's safety on the day of his assault.[18]  Indeed, Plaintiff's expert, Mr. Lawrence, offers no

opinion as to the liability of Defendants Couro, Floyd, Tattoli, and Clinton White.  *Id.*, Ex. G, at

62:13-63:8.

Furthermore, neither Lieutenant Schenck, nor Defendants Glover (the Administrator of

MYCF) and Hayman (the Commissioner of the NJDOC) could be held liable as superiors of the

unidentified COs or SID Investigator who might have been aware of White's vulnerability to

assault.  Civil rights claims cannot be premised on a theory of respondeat superior.  *Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, each named Defendant must be

shown, with particularity, to have been personally involved in the events underlying the claim.

*See Rizzo v. Goode*, 423 U.S. 362 (1976).  Indeed, in the context of section 1983 claims of

deliberate indifference, supervisory liability requires a demonstration of actual knowledge and

acquiescence in the alleged wrong.  *Rode*, 845 F.2d at 1207; *see also Baker v. Monroe Twp.*, 50

F.3d 1186, 1194 (3d Cir. 1995) (holding that actual knowledge may be reasonably inferred from

---

[18]Sergeants Tattoli and Couro, and COs Floyd and Clinton White were assigned in an area of MYCF outside of the FMU on October 29, 2007, but assisted in the subsequent investigation into White's assault.

the circumstances).  Here, there is no evidence that Lieutenant Schenck had actual knowledge of any risks to White's safety prior to the October 29, 2007, as discussed above.  With respect to Larry Glover, he was not the Administrator of MYCF at any point between March of 2007 and October of 2007.  (Mills-Rogers Decl., ¶¶ 10-11.)[19]  Thus, he could not have acquiesced in any deliberate indifference to a risk of assault on White.  With respect to George Hayman, he was the Commissioner of the NJDOC during the relevant period, but there is no evidence that he knew of or acquiesced in any deliberate indifference to a risk of assault on White, particularly since there are no written records of White's complaints regarding his assault or the threats to his safety.[20]

As to the handwritten note on White's file, "GKB Food," printed on October 29, 2007, the depositions of Investigators Trent and Williams indicate that the note was made by Williams *in the course of investigating White's assault*, as potentially relevant information.  Both Investigators concede that the note may have been written on October 29, 2007, but, when viewed in context, it is clear that the Investigators may have come across this information as early as October 29, 2007, when the investigation commenced, not before that date.  (Vanella Decl., Ex. D, at 113:24-115:19,146:7-147:3; Ex. E, at 32:17-21, 59:18-60:1, 64:14-23, 71:4-10.) Moreover, Investigator Williams could not recall the information that led him to make this note, and could not conclude that in fact White was "food" (or, a target) for the GKB; Williams speculated that he may in fact have believed White to be a member of the GKB during the course

_____

[19]Indeed, it appears that he was not employed with the NJDOC at any point between November 1, 2004 and January 28, 2008.

[20]To the extent that the allegations against Hayman include failure to provide adequate gang-related training to corrections officers, or failure to implement appropriate custody classifications, the Court has already rejected the argument that either of these alleged conditions presented a substantial risk of harm to White.

of the investigation.  *Id.*, Ex. E, at 70:25-73:18.  Therefore, the note does not indicate that the Defendants were aware of a threat to White's safety from GKB Blood-member inmates before the October 29, 2007 attack.

Plaintiff asserts that Investigators Trent and Williams could have known that White was particularly vulnerable to attack by Blood-member inmates on October 29, 2007, because they were in possession of intelligence that would have alerted them to this vulnerability: namely, Kashif Lewis' phone conversation of October 22, 2007, in which a third party ordered a hit (or hits) to be carried out.  (Burke Decl., Ex. B.)  Because the Investigators did not listen to Lewis' phone call in real time, or shortly thereafter, they did not know that of the threat to inmate safety.  Moreover, since Lewis was a known STG-member and leader, the Investigators' failure to monitor his phone calls constitutes deliberate indifference to inmate safety, Plaintiff argues.  The Investigators testified that every phone call made from MYCF is recorded; however, because of the sheer number of inmates with relatively free access to numerous phones in the facility, SID Investigators have no capacity to monitor the calls as they are being recorded.  (Vanella Decl., Ex. D, at 35:2-25, 125:25-126:4.)  Instead, they listen to phone calls when they have tips on illegal activity occurring, or if an officer has spare time, he may go and listen to recorded or live inmate conversations.  *Id.*  Investigator Williams testified that he was unsure what led him to look at Kashif Lewis' phone call records, but that he might have been given a tip by other inmates, in the course of his investigation, that Kashif Lewis ordered the attack on White.  *Id.*, Ex. E, at 34:13-35:22.  In any event, neither Investigator appears to have been given reason to believe that Lewis was actively engaged in planning an assault within the FMU facility *prior* to October 29, 2007.  To the extent that Plaintiff argues that the phone calls of all known STG member-inmates (or at least know STG leaders) should, as a matter of policy, be monitored in

real time, this strikes the Court as a very prudent suggestion.  However, neither a judge nor a jury

may freely substitute their judgment in matters of prison security for that of officials who have

made a considered choice, *see Whitley v. Albers*, 475 U.S. 312, 321 (1986), and, for the reasons

set forth hereinabove, the factual record provides no reasonable basis to conclude that the failure

to utilize such a policy created a substantial risk of harm to inmates in the FMU.

      With respect to the fact that the emergency egress door to pod number 5 was opened just

prior to White's attack, and the alarm disabled, it is clear from the Defendants' testimony that it

was typical for a door to be propped open for ventilation during painting.  According to COR

Iantorno and Lieutenant Schenck, because the FMU is a very low-security environment, it was

not considered a safety risk for the door to be propped open; indeed, COs do not need the

permission of their superiors to open an emergency door.  (Vanella Decl., Ex. B, at 101:3-

102:12; Ex. C, at 96:2-97:23, 101:22-109:7.)  However, COR Iantorno stated that, if he knew of

a potential threat to an inmate in his building, he would not authorize an emergency door to be

propped open without speaking to a superior, and Lieutenant Schenck testified that he would not

authorize a door to be opened if he knew that there was a potential threat to an inmate's safety.

*Id.*, Ex. B, at 195:2-20; Ex. C, at 98:20-99:13.  Given that the FMU provides prisoners with

relative freedom of movement, the Court cannot conclude that the practice of leaving an

emergency egress door open temporarily, where the on-duty officers were unaware of any threat

to White or other inmates, created a substantial risk of harm.  A reasonable person might

conclude that the routine practice of leaving such doors open, with the alarm disabled, in a

facility that houses hundreds of prisoners, some of whom are known STG-members, albeit in a

minimum security setting, is unwise, and even negligent.  But, for Eight Amendment purposes,

Plaintiff bears the burden of showing that such a practice constitutes deliberate indifference to a

known risk of substantial or pervasive violence among the inmates, and Plaintiff cannot point to evidence from which a reasonable fact-finder could draw such a conclusion.

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's section 1983 claims against Defendants Hayman, Glover, Schenck, Rodriguez, Iantorno, Trent, Williams, Floyd, Couro, Tattoli, and Clinton White in their individual capacities.  Therefore, the Court will not address Defendants' further argument that qualified immunity bars these claims.

### 3.  State Law Claims

In the remaining counts of the Complaint, Plaintiffs seek relief under a state law theory of negligence, and state constitutional claims.  The Court has supplemental jurisdiction over these claims, pursuant to 28 U.S.C. § 1367.  It must therefore apply the law of the forum state in reviewing the adequacy of these claims.  *Chin v. Chrysler*, 538 F.3d 272, 278 (3d Cir. 2008) (holding that federal court hearing state law claim in exercise of its supplemental jurisdiction must apply law of forum state to determine substantive matters).

### a.  Negligence Claims

Defendants maintain that Plaintiff's negligence claims are barred by the immunity conferred on public entities and employees by the New Jersey Tort Claims Act ("TCA"), N.J.S.A. 59:1-1, *et seq.*  The TCA provides that public entities are not liable for a tortious injury, except as set forth in the Act.  N.J.S.A. § 59:2-1a; *Chatman v. Hall*, 128 N.J. 394, 402, 608 A.2d 263 (N.J. 1992).  The liability imposed on public entities by the TCA is primarily that of *respondeat superior*:

[W]hen the public employee is liable for acts within the scope of that employee's

employment, so too is the entity; conversely, when the public employee is not liable, neither is the entity.

*Tice v. Cramer*, 133 N.J. 347, 627 A.2d 1090, 1094 (N.J. 1992). With respect to public employees, the TCA renders them liable for tortious acts to the same extent as private individuals, unless there is an applicable immunity provided by the Act itself, or by other laws. *Id.* at 1095 (noting that the public employee's liability is also "subject to any defenses that would be available" to a private person, pursuant to section 59:3-1b of the Act); N.J.S.A. 59:3-1a. The Act carves out several "immunizing" exceptions to these general liability provisions, including the exception set forth in section 59:5-2:

> Neither a public entity nor a public employee is liable for . . .
>> (b) any injury caused by:
>>> (1) an escaping or escaped prisoner
>>> (2) an escaping or escaped person; or
>>> (3) a person resisting arrest; or
>>> (4) a prisoner to any other prisoner.

In *Tice v. Cramer*, the New Jersey Supreme Court addressed whether this provision of the TCA confers immunity, where the public employee and entity are charged with negligence. 627 A.2d at 1092. There, the plaintiffs, who were injured when a police officer pursued a vehicle that failed to heed his command to stop, sued the police officer and the city on a negligence theory. *Id.* The defendants argued, *inter alia*, that section 59:5-2b(2) absolutely immunized both the police officer and the city. The Supreme Court agreed, holding that this section "immunizes both the employee and the entity for all acts of negligence . . . , whether those of the employee or the entity, and whether independent or not." *Tice v. Cramer*, 627 A.2d at 1100 (noting that the "obvious" policy considerations behind this immunity are "the encouragement of the police

officer [to] diligently and aggressively to enforce the law, thought to be diminished by the specter

of tort liability" for the individual officer, and by tort liability for the public entity, either in

*respondeat superior*, or for failure to train).  The only exception to the immunity conferred by

this provision applies to a public employee whose conduct "was outside the scope of his

employment or constituted a crime, actual fraud, actual malice or willful misconduct."  N.J.S.A.

§ 59:3-14a.  However, even if an public employee engages in willful misconduct, the public

entity which employees him is not vicariously liable such conduct.  N.J.S.A. § 59:2-10; s*ee also*

*Bernstein v. State*, 986 A.2d 22, 31 (N.J. Sup. Ct. App. Div. 2010).  "[W]illful misconduct," for

purposes of the TCA, "is not immutably defined[,] but takes its meaning from the context and

purpose of its use[.]"  *Fielder v. Stonack*, 141 N.J. 101, 661 A.2d 231, 242 (N.J. 1995).

However, it is "much more" that mere negligence: willful misconduct requires actual knowledge

that the act is wrongful.  *Id.*  In *Bernstein*, where the plaintiff sued defendant prison officials on

behalf of his deceased son, a prisoner who had been attacked and killed by another prisoner, the

New Jersey Superior Court, Appellate Division held that the plaintiff had failed to show that the

corrections officers engaged in willful misconduct, because there was a lack of evidence that they

acted with actual knowledge that they were violating an express, unequivocal order or command.

986 A.2d at 32 (noting that, indeed, there was a question whether any policy was even violated).

With respect to the prison administrator defendants, the Appellate Division further held that there

was no proof that the prison policy (which allegedly delayed assistance to the plaintiff when he

was attacked) "deviate[d] from a standard of care for correctional facilities."  *Id.*  Finally, there

was no evidence that any of the defendants were aware that the attacking prisoner posed a danger

to the other inmates, such that he should have been administratively segregated prior to the attack

on the plaintiff.  *Id.* at 32-33.

Here, Plaintiff alleges that Defendants' gross negligence and "willful and wanton" violations of the applicable standards of care proximately caused his assault in the FMU on October 29, 2007. (Compl., ¶ 95.) Defendants contend that, with respect to the public entity Defendants–the State, the NJDOC, and MYCF–any such claims against them are barred, because they cannot be held vicariously liable for the injuries caused to plaintiff by another prisoner, or for any willful misconduct on the part of the individual (public employee) Defendants. This is clearly true. *See* N.J.S.A. 59:5-2(b)(4), -10; *Tice v. Cramer*, 627 A.2d at 1100.

Defendants further contend that the individual Defendants are entitled to immunity under the TCA, because Plaintiff has failed to produce facts which could support a finding of willful misconduct. The Court agrees that, as in *Bernstein*, there are no facts in the record from which a reasonable factfinder could conclude that Plaintiff's injuries were caused by the Defendants' violation of an express order, or standard of care, with the requisite knowledge that their conduct was unlawful. *See Fielder*, 141 N.J. at 124. Indeed, as discussed above, accepting as true Plaintiff's testimony that he told certain officers about his vulnerability to attack by Blood-member inmates, there is no evidence that any of the Defendants were given this information by Plaintiff or by other officers. With respect to Mr. Lawrence's opinion that assigning only one corrections officer to supervise an area housing 96 prisoners was contrary to "generally accepted correctional doctrine and practice" which holds that a correction officer can reasonably be expected to effectively supervise no more than 60 inmates, he cites no regulatory or other clear articulation of this standard of care, such that Defendants Hayman or Schenck could be charged with knowingly disregarding its enforcement in the FMU. (Vanella Decl., Ex. F, at 5.) Moreover, Defendants testified that it was typical for only one CO to be assigned to supervise a wing of 96 prisoners, so the situation on the date of Plaintiff's attack does not represent a

deviation from the standard practice of that facility.  The evidence also shows that it was standard

practice for a CO to prop open an emergency egress door for ventilation purposes, and COR

Iantorno's opening of the emergency door on October 29, 2007 did not breach any existing policy

or procedure.  Thus, even if this policy is negligent, and provided inmates with unsupervised

access to Building 2, as Plaintiff alleges, there is no evidence from which a jury could conclude

that the Defendants Iantorno or Schenck engaged in willful misconduct by opening the door (or

allowing it to be opened).  Similarly, though Mr. Lawrence criticizes the classification

procedures used to house Plaintiff and other gang-member inmates in the FMU, and the alleged

lack of gang-related training and information provided to corrections officers, he points to no

applicable standards of care that the named Defendants are accused of having knowingly

violated.  In addition, there is no evidence suggesting that Investigators Trent and Williams

knowingly violated any express order or policy by failing to listen to phone records of Kashif

Lewis prior to October 29, 2007, since, in light of the SID's limited capacity, it was not standard

practice for any inmate phone calls to be monitored in real time.  There is no evidence of

pervasive gang violence in the FMU, such that a jury could reasonably conclude that the official

decisions to employ the foregoing policies constitutes willful misconduct.  Thus, Defendants

Hayman, Schenck, Iantorno, Trent, Williams, and Rodriguez are entitled to immunity from

Plaintiff's negligence claims under the applicable provisions of the TCA.  *See* N.J.S.A. § 59:5-

2(b)(4); *Tice v. Cramer*, 627 A.2d at 1100 .  Moreover, for the reasons set forth in section II.2.b

hereinabove, Plaintiff's negligence claims against Defendants Glover, Couro, Floyd, Tattoli, and

Clinton White must also be dismissed.

       b.  State Constitutional Claims

      In Count VI of the Complaint, Plaintiff alleges that Defendants were deliberately

indifferent to his state constitutional rights as set forth in Articles I through XI of the New Jersey Constitution.  Plaintiff quotes paragraph 1 of Article I, which provides that all persons have a natural and unalienable right to enjoy and defend life and liberty, to acquire, possess and protect property, and to pursue and obtain safety and happiness.  However, Plaintiff also alleges that Defendants' actions constituted willful disregard of Plaintiff's constitutional rights as an inmate, and thus the Court construes this Count to allege a violation of pargraph 12 of Article I,[21] the state constitutional analog of the Eighth Amendment to the federal constitution.  Courts in this District "have recognized that the Eighth Amendment and the parallel paragraph in the New Jersey State Constitution have been interpreted to provide congruent relief in the deliberate indifference context."  *Jumpp v. T.M. Power*, No. 08-4268, 2009 U.S. Dist. LEXIS 51269, at *10 (D.N.J. June 18, 2009) (citing, *inter alia*, *Ross v. Monge*, No. 07-2693, 2009 U.S. Dist. LEXIS 38029, at *13 n.4 (D.N.J. May 4, 2009)); *see also State v. Ramseur*, 106 N.J. 123, 169, 524 A.2d 188 (N.J. 1987).  The Court having found that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claims, Defendants are entitled to summary judgment on Plaintiff's analogous state constitutional claims.

---

[21]This paragraph provides, *inter alia*, that "cruel and unusual punishments shall not be inflicted."

**III.    CONCLUSION**

For the reasons set forth above, the Defendants' motion for summary judgment will be granted, and Plaintiff's motion for summary judgment on the issue of liability will be denied. Plaintiff's claims will, accordingly, be dismissed with prejudice.  An appropriate form of Order shall be filed together with this Opinion.

   /s Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: April 4, 2012